T.C. Memo. 1996-149

UNITED STATES TAX COURT

ESTATE OF JOSEPH CIDULKA, DECEASED, JAMES S. BOZIK,
ADMINISTRATOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 22456-91, 564-93.　　　　Filed March 25, 1996.

Joel Yonover, Brantley H. Wright, and Richard O. Kissel II, for petitioner.

Stewart T. Hittinger and Russell Pinkerton, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

SCOTT, Judge: Respondent in docket No. 22456-91 determined a deficiency in the estate tax of the Estate of Joseph Cidulka, deceased (decedent), in the amount of $1,223,726, and in docket No. 564-93 determined a deficiency in gift taxes of decedent and additions to tax for the calendar year 1982 as follows:

| | | Additions to tax | | | Tax |
|---|---|---|---|---|---|
| year ended | Deficiency | Sec. 6653(a)(1) | Sec.6653(a)(2) | Sec.6651(a)(1) | |
| Dec. 31, 1982 | $845,678 | $42,283.90 | 50% of the interest due on $845,678 | $211,419.50 | |

All section references are to the Internal Revenue Code as in effect at the time of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

A number of adjustments were made by respondent in the estate tax notice of deficiency, all of which have been disposed of by agreement of the parties, except those involving the proper valuation of gifts made by decedent in the years 1980, 1981, and 1982 of stock in State Outdoor Advertising, Inc. (SOAI), which respondent determined to be included in the taxable estate on which the tentative estate tax is computed.

Decedent filed no gift tax return for any of the years 1980, 1981, or 1982. The notice of deficiency for gift taxes is with respect to the year 1982 only but incorporates the amount of gifts for prior periods. It shows the amount of 1982 taxable gifts as $2,162,620, less a $10,000 annual exclusion, or a net of $2,152,620.

The notice of deficiency for gift tax for 1982 shows "Total Amount of Taxable Gifts for Prior Periods" as $95,789, whereas the notice of deficiency for estate tax shows adjusted taxable

gifts for the calendar year 1980 of $64,789, for 1981 of $66,524, and for 1982 of $2,223,958.

Neither party has explained to the Court the reason for the differences.

The major issue remaining for decision in both the estate tax case and the gift tax case is the value of the stock of SOAI transferred on January 25, 1982. The parties have stipulated that this value will also be the value in 1980 and 1981, except for petitioner's contention that market and minority discounts are applicable to these years. The following issues remain for decision in the gift tax case: (1) Whether petitioner is liable for gift taxes with respect to transfers of stock made by decedent, or his revocable trust, to his son and grandchildren in December 1980, December 1981, and January 1982; (2) whether the purported redemption on January 25, 1982, of stock of SOAI held by decedent's revocable trust was, in part, a gift to decedent's son; (3) the value of stock in SOAI on January 25, 1982; (4) whether annual gift tax exclusions are available with respect to decedent's transfers of stock in SOAI in 1980, 1981, and 1982 to his daughter-in-law and grandchildren; (5) whether petitioner is liable for an addition to tax under section 6651(a)(1) for decedent's failure to file a gift tax return for 1982; and (6) whether petitioner is liable for an addition to tax under section 6653(a)(1) and (2) for 1982 for negligence or intentional disregard of rules and regulations.

The only remaining issue in the estate tax case is the amount of prior years' gifts to be included in the amount of the taxable estate.

                    FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

The petitioner in these consolidated cases, docket Nos. 22456-91 and 564-93, is the Estate of Joseph Cidulka, deceased, James S. Bozik, administrator.  Mr. Bozik, whose office was located in Valparaiso, Indiana, was appointed administrator after the time of the filing of the petitions in these cases.  Decedent was domiciled in Portage, Indiana, at the time of his death.  A U.S. Estate Tax Return, Form 706, was timely filed on behalf of decedent's estate.  A U.S. Quarterly Gift Tax Return, Form 709, for the calendar quarter ended December 31, 1976, was filed by decedent and was the only gift tax return ever filed by decedent.

Decedent was predeceased by his wife, Helen Cidulka. Decedent's son, Mr. John C. Cidulka (John Cidulka or John), was predeceased by his wife, Charlesa Cidulka.  John and Charlesa Cidulka had two children, John Joseph Cidulka (John Joseph), born on January 16, 1968, and Lauren Jean Cidulka (Lauren), born on June 28, 1965.  John Cidulka married Marilyn Cidulka following the death of Charlesa Cidulka.

Decedent was born on February 24, 1904, and died on October 20, 1987.  John Cidulka died on November 14, 1993.

From April 1950 until January 25, 1982, decedent owned the majority of common stock in SOAI, a closely held corporation. SOAI was taxed as a regular or C corporation during the period 1980 to 1982.  In 1960, after a 5-for-1 stock split, decedent owned 850 of the 990 outstanding shares of SOAI.  The other two shareholders were decedent's wife with 5 shares, and Mr. James C. Hull, an unrelated party, with 135 shares.  From 1960 to December 1977, decedent transferred by gift 366 shares of stock in SOAI to John Cidulka.  Decedent retained 448 shares.  Prior to 1977, 176 shares were acquired by SOAI and held by SOAI as treasury stock. During the period 1960 to December 1977, decedent made annual gifts of common stock varying from 3 to 10 shares to both John Cidulka and Charlesa Cidulka.  On the same days that Charlesa Cidulka received stock as a gift from decedent, these same shares were reissued to John Cidulka.  Charlesa Cidulka never retained the ownership of the shares of stock she received from decedent. The stock transfer record indicates that on 14 different occasions during the period 1963 through 1982 Charlesa Cidulka received shares from decedent and transferred them to John Cidulka on the same day.

On October 14, 1979, decedent transferred his 448 shares in SOAI to the Bank of Indiana, trustee of the Joseph Cidulka Revocable Trust (the revocable trust).  The Joseph Cidulka revocable trust agreement (the revocable trust agreement) was dated September 28, 1979.  In article 8 of the revocable trust

agreement, decedent reserved the right to revoke, modify, or otherwise alter the terms of the trust, in whole or in part. On December 17, 1980, and again on December 28, 1981, 3 shares of stock in SOAI were transferred from the revocable trust to each of four members of decedent's family: His son John Cidulka, his daughter-in-law Charlesa Cidulka, his grandson John Joseph, and his granddaughter Lauren. Lauren and John Joseph signed the stock transfer records with respect to the shares transferred to them in each of the years 1980 and 1981. Despite these purported transfers, SOAI's 1980 and 1981 U.S. Corporation Income Tax Returns, Forms 1120, listed only two stockholders, decedent with a 51-percent interest, and John Cidulka with a 49-percent interest in the outstanding corporate stock.

On the morning of January 25, 1982, decedent owned, in trust, 424 shares, representing 52 percent of the outstanding 814 shares of SOAI. On that day, decedent resigned as chairman of the board and retired from SOAI. Also on that day, decedent and SOAI rescinded a stock redemption agreement applicable to the stock of SOAI. Also on that day, decedent transferred by gift 40 shares of SOAI to family members and sold his remaining shares of stock to SOAI in exchange for a promissory note in the face amount of $370,000 (the promissory note). Decedent's attorneys, Mr. Clyde Compton and Mr. Ed Hussey, planned the stock transfers. Decedent did not obtain an appraisal of SOAI to determine the fair market value of the stock as of the date of the sale of his

stock to SOAI. Decedent filed no gift tax return for 1980, 1981, or 1982 reporting a taxable gift either of the 40 shares he transferred by gift, or any gift resulting from the sale of his SOAI stock for less than adequate and full consideration in 1982, if in fact it was sold for less than its full value.

The determined value for which decedent sold his stock to SOAI was based upon the book value of SOAI as of December 31, 1981. The book value of the corporation at the date of this exchange approximated $784,323, or $963.54 per share for each of the 814 shares outstanding.

After the redemption of decedent's stock, the stock transfer record indicates that there were three shareholders: John Cidulka with 398 shares; John Joseph with 16 shares; and Lauren with 16 shares. The remaining 560 shares were held as treasury stock. Neither John Joseph nor Lauren signed the SOAI stock transfer records acknowledging receipt of the 10 shares each of SOAI stock given to them on January 25, 1982.

On December 31, 1985, SOAI entered into an asset purchase agreement with Whiteco Metrocom (Whiteco), selling all of its assets to Whiteco for a purchase price of $7 million. Whiteco did not have a monopoly of the outdoor advertising business in the area where it operated after the asset sale. The assets sold to Whiteco included the outdoor signs, ground leases, advertising contracts, permits, parcels of real estate, vehicles, equipment, inventory, furnishings, parts, materials, and other contracts.

On December 31, 1985, Whiteco also purchased the real property where the business office of SOAI was located, in Gary, Indiana, for $300,000, in a separate agreement with the Cidulka family partnership which owned the building. The gross rent multiplier for this sale based on the gross rentals for the calendar year 1985 is 3.11.[1]  If gross rentals are reduced by estimated accounts receivables of $500,000 the multiplier is 2.89.

Whiteco converted many of the SOAI poster billboards to permanent paint billboards. Whiteco replaced many of the billboards at these locations from 4 to 12 years after January 25, 1982.

The replacement cost of all 578 billboards of SOAI involved in the sale by SOAI to Whiteco would have been approximately $6 to $6 1/2 million, without including lease-up costs.

The book value of the assets sold in January 1985, as reflected on the Schedule M of the SOAI Form 1120 for the year ended December 31, 1985, totaled $851,176, summarized as follows:

| | |
|---|---|
| Inventories | $89,440 |
| Fixed assets | 673,119 |
| Land | 88,617 |
| Total | 851,176 |

---

[1]  The gross rent multiplier or gross income multiplier is the amount by which gross rentals from the immediately preceding year must be multiplied to arrive at the sale price for the business assets purchased.

The final liquidating distribution of SOAI was made on August 18, 1986, solely to John Cidulka in the amount of $6,038,820. SOAI retained cash in the amount of $831,394 to pay income taxes for the taxable year ended October 31, 1986, and any other remaining liabilities. No distributions were ever made to John Joseph or Lauren. Neither John Joseph nor Lauren ever received any benefits or distributions from his or her purported stock interests in SOAI.

On December 23, 1986, John Cidulka entered into an assignment agreement with SOAI to assume the entire obligation on the promissory note given to decedent for his stock. Immediately after John Cidulka assumed the obligation on the promissory note, decedent forgave $20,000 on the principal of the promissory note.

Although each grandchild of decedent, John Joseph and Lauren, owned 16 of the 430 shares outstanding when SOAI was dissolved, they assumed no portion of the promissory note.

The fair market value of the promissory note, based on the self-canceling clause in the note, was $307,381.09 on January 25, 1982.

SOAI was incorporated in the State of Indiana, which was the major area in which it operated its outdoor advertising business. SOAI had signs located in northwest Indiana in Lake, Porter, and LaPorte Counties, and in a few locations in Cook County, Illinois. The principal cities in Lake County are Gary, Hammond,

East Chicago, and Whiting.  SOAI's business office was located in Gary, Indiana.

Mr. Kenneth Krupinski of Swartz, Retson, Kettas & Franko was SOAI's primary certified public accountant during the years 1979 until the sale of the assets on December 31, 1985.  The financial statements of SOAI were unaudited.  SOAI's accountants prepared annual compilations based on the information presented to them by officers and employees of SOAI.

In the years 1977 through 1981, SOAI's compound annual growth in sales volume was 4.75 percent per year, which is considered average to above average in the outdoor advertising industry.

The assets of SOAI primarily consisted of outdoor advertising structures, more commonly known as billboards, located on leased sites along highways.  The SOAI assets other than billboards were recorded at cost and were generally depreciated on a straight-line basis over their estimated useful lives.

SOAI had no long-term debt on December 31, 1981, other than a life insurance policy loan, and was in stable financial condition.

SOAI's gross income consisting of its gross rental revenues totaled $1,578,555 in 1981.  This income increased to $1,623,800 in 1982 and to $2,249,486 in 1985.

SOAI had more billboards than any other company in its market area of northwest Indiana, despite the fact that it faced substantial outdoor advertising competition from Whiteco, 3M National, Bik/Odeguard, and various individuals in 1981 and 1982. Neither SOAI nor Whiteco had a monopoly in the local market area.

SOAI had a diversified customer base and was not dependent on any one lease for more than a small portion of its business. Petitioner did not identify any specific sign location that SOAI lost during the years at issue, although an attrition rate of 0.5 to 1 percent per year was standard in the outdoor advertising industry. SOAI's value is attributable to its lease contracts associated with its outdoor advertising structures, and its income was derived primarily from advertising contracts for the use of outdoor signs.

The billboards on which the outdoor advertising industry sells advertising space are typically constructed from wood or steel and are generally located on leased property. The billboard space is rented to the advertiser for a specific time period. Each billboard is covered either with a "posted" paper or hand-painted advertising messages supplied by the advertiser or an advertising agency.

The Outdoor Advertising Association of America, which is a national trade association representing the outdoor advertising industry, suggests standards for billboards. Types of billboards include permanent paints (paints), rotary bulletins, posters, and

deluxe posters.  Paint structures vary in size and shape, and generally have a fixed-term contract for the advertising space. The advertisement is permanently painted on the sign face.  Paint structures may be standard or nonstandard in size.  National advertisers typically avoid nonstandard signs.  Paint structures have less turnover than other structures since their message generally involves advertising of a certain location.  This results in less vacancy and higher gross sales volumes.  Paint structures require less maintenance because of the lower turnover rate.  Poster and rotary bulletin units are utilized by advertisers for shorter periods of time and have higher maintenance cost than paints.  SOAI was primarily a paint operation on the valuation date, January 25, 1982.

Posters are standardized advertising copy printed on posting paper and pasted on the face of the sign structure.  A poster copy size is standard throughout the industry at 12 feet 3 inches high by 24 feet 6 inches long.  Industry-wide posters have the highest vacancy of any billboards throughout the United States.

Deluxe posters, also known as junior posters or 8-sheet poster panels, are small standardized advertising copy printed on posting paper and pasted on the face of the sign structure.  A deluxe poster measures approximately 6 feet in height by 12 feet in length.

Rotary bulletins have consistent face sizes on varying types of structures.  The advertising copy is rotated between various

locations during the course of the total contract. Rotary
bulletins are generally 14 feet high by 48 feet wide, which is
the same size as standard paint signs.

Directional billboards are very specific in nature,
providing specific information content to a motorist as to how to
get to a particular location or advertiser, and are prominently
placed or displayed on nonstandard signs. All directional
advertising is local advertising for an establishment at a
particular location. Directional outdoor advertising differs
from traditional or standard outdoor advertising due to the
nature of the advertisements, and often the actual size of the
signs. Directional advertising contracts are typically 2 to 3
years in length with no price increase built into the contracts.

Any outdoor advertising structure, including permanent
paint, rotary bulletins, posters, or deluxe posters, can be used
for national, regional, directional, or local advertising. The
structure of the billboard is the same whether the message refers
to national advertising or directional advertising.

Local businesses represent 70 percent of the annual revenues
of the billboard industry nationwide. Typically, national
advertisers spend the greatest amounts of revenue on the east and
west coasts, principally in the larger cities. The central
United States has the lowest percentage of national advertisers
as compared to advertising by local businesses. In the SOAI
market area, 80 to 90 percent of the advertising is local. Local

directional advertisers are generally the most durable advertisers because the signs they use have to be in a certain location directing customers to a specific place of business. The rate charged for the face of a specific sign is the same whether a national advertiser or local advertiser is the client.

The most important factor in outdoor advertising is location. Interstate highways and freeways are the most prized locations in outdoor advertising. Locations have value, even if the structures are old and decrepit. In some instances it may not be possible to replace old, decrepit structures because of local government regulations. However, such regulations may be beneficial to advertisers already established in the market.

Traffic patterns are very important in the outdoor advertising industry. The major roadway systems through the SOAI market area include: Interstate 65, a north/south interstate highway through Lake County, Indiana; Interstates 80, 90, and 94, east/west interstate highways through Cook County, Illinois, and Lake, Porter, and LaPorte Counties, Indiana; U.S. Highway 30, an east/west U.S. highway through Lake, Porter, and LaPorte Counties, Indiana; U.S. Highway 41, a north/south U.S. highway through Lake County, Indiana; and U.S. Highway 6, an east/west U.S. highway through northern Indiana. The interstate systems and many of the highways in the SOAI market area lead directly into the Chicago area.

- 15 -

Sales of outdoor advertising companies are generally sales of the assets of the business rather than sales of the stock. Persons in the industry believe that the small number of stock sales of outdoor advertising companies is due to the reluctance of buyers to take the risk of unknown liabilities from past operations of a corporation, and to deal with the tax issues raised by buying the stock of a corporation and liquidating the corporation.  Existing outdoor advertising plants are attractive acquisition candidates because of the small number of locations available for new construction.  Not all buyers of outdoor advertising companies in the last 10 years, however, have previously been in the outdoor advertising industry.

Approximately 62 percent of SOAI's paints in 1981 were illuminated, utilizing older gooseneck-style lighting.  SOAI's nonstandard inventory consisted predominantly of multipost structures made from creosote wood poles, which were less desirable to national advertising than the more modern standardized uni-pole paint.  SOAI's paints were generally smaller in size than standard paints and offered an economical alternative to local advertisers.  SOAI's inventory of sign faces as of December 31, 1981, was as follows:

State Outdoor Advertising, Inc.
Inventory of Sign Faces
<u>December 31, 1981</u>

| <u>Size of face</u> | <u>Number</u> | <u>Percent of total</u> |
|---|---|---|
| Nonstandard size paints | | |
| 6' x 16' Panels | 151 | 26% |
| 12' x 44' Paints | 85 | 15 |
| 10' x 43' Paints | 36 | 6 |
| Miscellaneous size paints[1] | <u>53</u> | <u>9</u> |
| Total nonstandard size paints | 325 | 56 |
| Standard size signs | | |
| 14' x 48' Paints | 70 | 12 |
| 12' x 25' Posters | <u>183</u> | <u>32</u> |
| Total standard sign faces | 253 | 44 |
| Total sign faces | 578 | 100 |

[1] Includes 8' x 18', 8' x 20', 8' x 24', 10' x 24', 10' x 25', 10' x 30', 10' x 40', 10' x 44', 10' x 50', 12' x 42', 12' x 50', 15' x 50', and 15' x 75' sized signs.

SOAI paid its officers the amounts indicated below for the years indicated:

| Year | Decedent | John | Patrick Green |
|---|---|---|---|
| 1979 | $75,262 | $120,190 | $37,174 |
| 1980 | 86,892 | 137,150 | 44,292 |
| 1981 | 89,510 | 147,946 | 46,200 |
| 1982 | 3,900 | 162,033 | 48,554 |

Patrick Green was not a member of the Cidulka family.

After the date of his resignation, decedent received no further benefits as an employee or shareholder of SOAI other than his pension benefits, which had already accrued.

During the years 1981 and 1982, John Cidulka was involved in nearly every aspect of SOAI, including accounting, sales, construction, collection of accounts, leases, site selection, construction of signs, and supervision of employees. In 1981, the total number of employees of SOAI was 25. After January 25, 1982, no member of the Cidulka family, other than John Cidulka, was employed by SOAI, except for Lauren, who was employed on a part-time basis in 1982 and 1983, for which she received $1,200 and $2,300, respectively.

In 1981, SOAI had a profit-sharing plan. The formula for contributions was 5 percent of earned payroll. John Cidulka received only the pension benefits received by other employees, but he did receive a company car and other related benefits.

The unaudited balance sheets of SOAI for its fiscal years 1977 through 1981 in summary show the following:

STATE OUTDOOR ADVERTISING, INC.
Balance Sheet Summary
December 31, 1977 through 1981
Unaudited--Compiled

| Assets | 1977 | 1978 | 1979 | 1980 | 1981 |
|---|---|---|---|---|---|
| Cash | $43,249 | $13,913 | ($1,870) | ($20,209) | $-0- |
| Accounts receivable | 80,073 | 73,390 | 69,820 | 79,393 | 100,457 |
| Other | -0- | -0- | 20,284 | 12,894 | 15,053 |
| Total current assets | 123,322 | 87,303 | 88,234 | 72,078 | 115,510 |
| Fixed assets at cost | 868,285 | 899,498 | 1,075,979 | 1,154,330 | 1,195,232 |
| Less: accum. depreciation | (458,552) | (470,956) | (485,735) | (502,526) | (529,414) |
| Net fixed assets | 409,733 | 428,542 | 590,244 | 651,804 | 665,818 |
| Land | 172,911 | 175,638 | 175,638 | 175,638 | 64,060 |
| Other assets | 10,917 | 16,954 | 18,617 | 24,359 | 24,335 |
| TOTAL ASSETS | 716,883 | 708,437 | 872,733 | 923,879 | 869,723 |
| Liabilities and equity | | | | | |
| Bank overdraft | -0- | -0- | -0- | -0- | 48,049 |
| Accounts payable | 3,897 | 13,488 | -0- | -0- | -0- |
| Notes payable | -0- | -0- | 20,000 | 15,000 | 15,000 |
| Accruals: other | 22,120 | (19,640) | 45,289 | 20,221 | 6,666 |
| Total current liabilities | 26,017 | (6,152) | 65,289 | 35,221 | 69,715 |
| Note payable: bank | -0- | -0- | 78,333 | 99,877 | -0- |
| Note payable: Manhattan Life | -0- | -0- | -0- | 21,042 | 21,042 |
| Total long-term liabilities | -0- | -0- | 78,333 | 120,919 | 21,042 |
| Common stock | 19,800 | 19,800 | 19,800 | 19,800 | 19,800 |
| Retained earnings | 709,541 | 733,265 | 747,787 | 786,415 | 797,642 |
| Less: Treasury stock | (38,476) | (38,476) | (38,476) | (38,476) | (38,476) |
| Total equity | 690,865 | 714,589 | 729,111 | 767,739 | 778,966 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | 716,882 | 708,437 | 872,733 | 923,879 | 869,723 |

Set forth below is a comparative statement of income of SOAI for the years ending 1981 and 1982 as shown by its unaudited records:

|                          | 1981<br>Amount | 1982<br>Amount |
|--------------------------|------------|------------|
| Sales                    |            |            |
| Net sales                | $1,578,555 | $1,623,800 |
| Total direct costs       | 825,998    | 881,515    |
| Gross margin             | 752,557    | 742,285    |
| Total operating expenses | 806,927    | 773,758    |
| Operating income (loss)  | (54,370)   | (31,473)   |
| Other income             | 59,310     | 27,678     |
| Net income (loss)        | 4,940      | (3,795)    |

The 1979-82 recession resulted in the loss of population and jobs in the Lake County area. For the years 1980, 1981, and 1982, the unemployment rates were 14.3 percent, 11.8 percent, and 16.09 percent, respectively. The Lake County unemployment rate remained above 10 percent until 1987. In 1982, the Lake County unemployment rate was more than 40 percent above the unemployment rate for the State of Indiana. Per capita personal income increased in the Lake County area every year except 1982, though it declined relative to the rest of the State.

Lake County's population peaked at 551,100 in 1971. By 1982, the county had lost 36,800 persons or 6.7 percent of its population. By 1987, there was an additional shrinkage of 27,700. The population of Lake County has represented a smaller percentage of the State's population every year since 1965.

Examples of the gross income multipliers of asset purchases of companies engaged in the outdoor advertising business made on the dates indicated were as follows:

| Date | Seller | Sale price | Gross rental income | Gross rent multiplier[1] |
|------|--------|-----------|---------------------|---------------------------|
| Dec. 1980 | Piedmont | [2] | Unknown | 3.00 |
| July 1981 | Atlanta Outdoor | $5,100,000 | $1,730,000 | 2.95 |
| Jan. 22, 1982 | Naegele Outdoor | 31,972,544 | 10,174,393 | 3.14 |
| Mar. 1, 1982 | Creative Displays | 3,614,673 | 1,204,891 | 3.00 |
| Apr. 1982 | Peck Sign | 3,485,000 | 1,013,080 | 3.44 |
| Apr. 15, 1983 | Austin Displays | 5,500,000 | 1,504,000 | 3.70 |
| Aug. 19, 1983 | Creative Displays | 27,000,000 | 8,700,000 | 3.10 |
| Jan. 1, 1984 | Roberts Outdoor | 4,000,000 | 984,000 | 4.10 |
| May 24, 1985, | Major Media | 400,000,000 | 89,764,000 | 3.90 |
| Jan. 1, 1987 | Palmer Outdoor | 3,050,000 | 902,776 | 3.38 |

[1] Includes sign (plant) structures only.

[2] Negotiated on the basis of "Three (3) times the aggregate billings for outdoor advertising space for the twelve (12) months ending November 30, 1980, plus one-half (1/2) of the book value as of November 30, 1980, of Piedmonts Inventories--including autos, trucks, personal property, etc."

During the 20-year period from 1974 to 1993, there were at least 140 sales of assets of outdoor advertising companies. During the 4 years 1980 through 1983, there were at least 43 such sales: 6 in 1980, 8 in 1981, 10 in 1982, and 19 in 1983. One of

the sales was of a 49-percent interest. Of the 42 remaining sales, 4 were for a gross income multiplier (multiplier) of less than 2.5, 18 were at a multiplier of above 3, and 19 were in the range of 2.5 to 3. Of the 4 sales that were at a multiplier of less than 2.5, one was at 2.2, one at 2.36, and two at 2.41. The sale at a multiplier of 2.2 involved only 2 billboard faces. The sale at a multiplier of 2.36 was primarily of poster billboards. The highest of the 42 sales was at a multiplier of 4.1.

The prime interest rate, the rate a bank charges to its best customers, was between 15.75 and 16.5 percent from prior to December 1981 to February 1982.

Listed below are the yields as of January 1982 on the following types of securities:

| Type of security | Rate of return |
|---|---|
| Corporate bonds (Aaa) | 15.8% |
| Corporate bonds (A) | 16.19 |
| U.S. bonds--5 years | 15.5 |
| U.S. bonds--10 years | 14.57 |

A notice of deficiency was timely mailed to petitioner in docket No. 22456-91 on July 17, 1991, with respect to the estate tax liability. A notice of deficiency was timely mailed to petitioner in docket No. 564-93 on October 27, 1992, with respect to the gift tax liability of decedent for the year ended December 31, 1982. Respondent in her notice of deficiency in gift tax stated with respect to the value of gifts made by decedent in 1982 as follows:

It is determined that on January 25, 1982, the donor as co-trustee of the Joseph Cidulka Revocable Trust, transferred 424 shares of State Outdoor Advertising, Inc. with a fair market value of $2,470,000.00 from a grantor trust. As consideration for this transfer, the donor received a promissory note with a fair market value of $307,380.00. Therefore, the total gifts of the donor are increased $2,162,620.00 for the gift tax year ended December 31, 1982.

OPINION

The major issue in this case is the value of the stock of SOAI on January 25, 1982. For some years prior to 1982 decedent had from time to time given stock in SOAI to his son John Cidulka and to John's then wife Charlesa Cidulka, who had immediately transferred the shares to John, so that as of the end of 1981, John Cidulka held 378 shares of stock of SOAI including shares given to him and Charlesa Cidulka in 1981. A revocable trust set up by decedent to hold certain assets of his, including stock in SOAI, held 424 shares at the end of 1981 and 6 shares were listed in the names of each of John Cidulka's children, John Joseph and Lauren, who were in their teens. Of the 6 shares held by each child, 3 shares had been transferred by decedent in 1980 and 3 shares in 1981. As of the beginning of January 25, 1982, decedent owned through his trust approximately 52 percent of the outstanding shares of SOAI consisting of 424 shares, and the remaining shares totaling 390 were held by John Cidulka and in the names of his two children.

The parties disagree as to whether the gifts made on January 25, 1982, whereby the trust transferred 10 shares to John

Cidulka, 10 shares to Charlesa Cidulka, who immediately transferred them to her husband John, and 10 shares each to John Joseph and Lauren, should be viewed as a separate transaction from the redemption by the corporation of the remaining 384 shares held by the trust for decedent. Petitioner contends that the gifts were a separate transaction from the redemption so that the shares involved in each transaction should be valued as involving a minority interest. Respondent contends that the January 25, 1982, gifts and redemption were in fact one transaction, so that the value of the stock transferred on January 25, 1982, should be valued as a majority interest in SOAI. Respondent also contends that the gifts of stock made in 1980 and 1981 to John Cidulka and his two children were part of an overall continuing plan and, therefore, should also be valued as part of a majority interest in SOAI. This record is clear that decedent discussed with his accountant and two lawyers a plan to dispose of his interest in SOAI to his son John Cidulka by gift in a manner which would avoid all gift taxes and estate taxes. The underlying plan was that minority interests would be valued at book value and, therefore, each gift made to each individual would be an amount that would be less than $10,000, in 1982 and less than $3,000 in prior years when that was the exclusion for gift taxes. It was the plan then that the redemption price would be the book value of the shares remaining in the trust for decedent since that would constitute less than a

majority interest. While, on this record, the per-share book value probably was less than the fair market value even on a minority interest basis, we conclude from the facts in this case that the 40 shares given by decedent to his son and his son's family on January 25, 1982, and the redemption of the remaining shares held in trust for him was one transaction. It was planned as one transaction. Although the record does not show the exact time on January 25, 1982, that the gifts and the redemption occurred, it does show that both occurred on the same day. The plan was that both were to occur on the same day, and the only reason that it was done as two separate transactions was to avoid gift taxes. On the facts in this record, we conclude that in effect the 424 shares of SOAI stock were given to John Cidulka on January 25, 1982, to the extent the value of the shares exceeds the fair market value of the note given by SOAI to decedent in purported redemption of his stock. The purported gift to John Cidulka's wife Charlesa is clearly a gift to John. For a number of years decedent had given shares to Charlesa, who had immediately transferred them to John. Our inference from this record is that the shares were given to Charlesa to be passed on to John, and were, in fact, a gift to John. Petitioner argues that respondent has not offered proof that there was an understanding between decedent and Charlesa that her shares would be merely a pass-through of shares to John. However, from the fact of the number of times that this occurred, we conclude that

the inference is that there was such an understanding. Petitioner, of course, has offered no proof that there was not such an understanding and, since respondent determined that the shares were gifts to John Cidulka, the burden is on petitioner to show to the contrary. We also conclude from the record that the 1982 transfers of 10 shares each to John Cidulka's teenage children were not intended as gifts to them. They did not acknowledge receipt of these shares on the records of SOAI and were not listed as shareholders by SOAI, nor did they ever derive any benefit from ownership of these shares. When the SOAI assets were sold, they received none of the proceeds. John Cidulka's children were adults at the time of this trial, but were not called as witnesses. Based on the evidence in this case, we conclude that on January 25, 1982, 424 shares of SOAI stock, which constituted a majority interest, were effectively transferred to John Cidulka and, therefore, we are valuing the transfer of a controlling interest in SOAI to John Cidulka on that date. Furthermore, this Court and the Court of Appeals for the Seventh Circuit have held that a hypothetical bifurcation of stock for the purpose of its valuation as a minority interest will not be recognized since it would be an easy method of implementing a tax-avoidance scheme. Northern Trust Co. v. Commissioner, 87 T.C. 349, 386-388 (1986); see also Estate of Curry v. United States, 706 F.2d 1424, 1426-1430 (7th Cir. 1983). For this further reason we considered a majority interest in the

stock of SOAI to be the interest to be valued.  Neither party questions the fact that a 52-percent interest, which the 424 shares represented, is a controlling interest under Ohio law.

Both parties recognize that where a gift of property is made, the gift tax is based on the fair market value of the property given, which is the price at which the property would change hands between a willing buyer and a willing seller, both having reasonable knowledge of relevant facts.  United States v. Cartwright, 411 U.S. 546, 551 (1973).

Where, as here, the property given is stock in a closely held corporation which is not listed on any exchange and of which there have been no sales, it is difficult to determine fair market value.  Very often fair market value can be determined by reference to sales of stock of publicly held comparable corporations.  However, no witness in this case, including each of petitioner's expert witnesses and each of respondent's expert witnesses, knew of any sale of stock of any outdoor advertising company.  The experts offered by each party stated that generally where there was a sale of an outdoor advertising company, the sale would be of the assets, since the value of the company was primarily in its leases and billboards on those leases.  The experts offered by each of the parties stated that there might have been some sale of stock of an outdoor advertising company, but they knew of none.  However, they were aware of a number of sales of the assets of outdoor advertising

companies.  They, therefore, turned to other methods of determining the value of the SOAI stock.

As we stated in Estate of Leyman v. Commissioner, 40 T.C. 100, 119 (1963), remanded on other grounds 344 F.2d 763 (6th Cir. 1965), in situations where it is difficult to find sales of comparable companies, consideration may be given to the value of the underlying assets, the earnings, dividends paid, and numerous other factors which would bear on a determination of value.  We recognized there, as we do here, that the opinion of experts is of assistance, but that even though we weigh the testimony of experts in light of their qualifications as well as the other credible evidence in the record, we are not bound by the opinion of any expert witness and accept or reject expert testimony in the exercise of sound judgment.  Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990).

Here, petitioner's experts gave great weight to the book value of SOAI in arriving at the value of the stock transferred.  However, the record is clear that book value of an outdoor advertising company has very little relevance to the company's fair market value, since it is the worth or market value of the leases and billboards located thereon that creates the primary asset value of the company.  These properties may have been acquired many years prior to the valuation date and been depreciated on the books even though an actual increase in value had occurred.  Petitioner's experts attempt to back up their

valuation of the stock at book value of the assets by an income capitalization method. Certainly, an appropriate income capitalization method of valuation would be probative evidence. The income capitalization method was recognized by both petitioner's and respondent's experts to be properly based on the operating income of a company divided by an appropriate capitalization rate. While there are some differences between the parties as to the capitalization rate, the major difference is in a proper operating income. The books of SOAI were not audited, and it is difficult to ascertain a proper operating income from the records as kept.

The main adjustment made by petitioner's experts to petitioner's income as reported to obtain an amount they considered operating income was to add back to income part of the officer's salaries paid and deducted, which they considered excessive. Based on this adjustment, one of petitioner's experts arrived at an operating income for 1981 of $215,000, which, when divided by the capitalization rate used by that expert, resulted in a value of the company on January 25, 1982, of approximately its book value. Based on a study of other companies, one of respondent's experts concluded that operating expenses would be approximately 66 percent of revenues, and, therefore, the operating profit would be approximately 34 percent of revenues, or an amount for 1981 in excess of $500,000. Dividing this computed operating income by the capitalization rate respondent's

expert used resulted in an amount of approximately $4,470,000 as the worth of the company on January 25, 1982. Respondent's expert stated that depreciation should not properly be considered as an operating expense, and that the rent paid by SOAI was paid to members of the Cidulka family and, therefore, was suspect. Respondent's expert concluded that officer's salaries were overstated and that there were other questionable items deducted as operating expenses by SOAI in 1981. It is clear that petitioner's expert and respondent's expert each in effect made a judgment determination as to the operating income of SOAI. We conclude that from this record an accurate operating income for 1981 cannot be determined.

Respondent's expert took the position that since many sales of outdoor advertising businesses were negotiated on the basis of a multiplier of gross income or net sales which he concluded in this case were the same, the most appropriate method and best supported method of determining the value of the assets of SOAI would be to apply an appropriate multiplier to the gross income of SOAI for 1981. The amount of net sales of SOAI as shown on its records for each year here involved is considered to be accurate by both parties. After the value of the assets is obtained by multiplying gross income or net sales by an appropriate multiplier, certain adjustments are made for liabilities and certain other items to arrive at the total value of the stock. Petitioner's experts conceded that there were

sales of assets made by a number of outdoor advertising companies throughout the years here in issue, and that in some instances a multiplier of the gross receipts or gross income of the company for the year preceding the year of the sale was used to determine the value of the assets. However, petitioner contends that no accurate multiplier can be determined from this record. Petitioner recognized that one of respondent's experts, Mr. Ruppert, had an extensive database of asset sales by outdoor advertising companies over a 20-year period which, in many cases, he had personally verified, but contends that the companies in the database were not shown to be comparable to SOAI.

This record shows that in January 1986, SOAI sold all of its assets to Whiteco for $7 million. This sale was at a multiplier of 3.11, and after adjustments by respondent's expert to eliminate amounts not allocable to the billboards and leases owned by SOAI, was at a multiplier of 2.89. Petitioner strenuously objects to any weight being given to the actual sale of the assets of SOAI contracted for in December 1985 and made in January 1986, since there had been changes made in some of the signs, and actually some signs added between January 1982 and January 1986. However, these changes and additions are reflected to an appreciable extent in revenues received in 1985. In 1981, SOAI's net sales were $1,570,555 and in 1985 were $2,249,486. While 4 years in some instances might be considered too remote to have a real bearing on the valuation of the stock at the earlier

date, the multiplier used for the 1986 sale gives an indication of how the value of all the SOAI assets might be determined for a sale at fair market value at an earlier date. This is particularly true where, as here, some asset sales of other companies are shown to have been made near the January 25, 1982, valuation date at a multiplier of around the multiplier at which SOAI's assets were sold in 1986. The record also contains one sale within a year of the SOAI asset sale at a multiplier slightly greater than the multiplier determined for the SOAI sale. Therefore, in our view, the sale by SOAI in January 1986 of all its assets has relevance in determining an appropriate multiplier to determine the fair market value of SOAI's assets on January 25, 1982.

Petitioner attacked the data used by respondent's expert to obtain the net sales multipliers by referring to a book written by a recognized appraiser with respect to net sale multipliers. However, even if such an out-of-court statement could have value in any case, the statement referred to by petitioner does not, since it is unclear to which companies it would apply. Respondent's witness, Mr. Ruppert, kept his database for use in advising business clients with respect to purchases and sales of the assets of outdoor advertising companies. In our view, Mr. Ruppert's database is reasonably accurate and supports his opinion.

The parties argue extensively as to whether there had been any prior negotiations between decedent or John Cidulka and Whiteco before the offer that resulted in the sale of SOAI assets to Whiteco for $7 million in January 1986 was made. In preparing his report, respondent's expert, Mr. Ruppert, interviewed an officer of Whiteco, who stated that there had been discussions between decedent and Whiteco officials, and also between John Cidulka and Whiteco officials, with respect to a sale of the SOAI assets to Whiteco on the basis of a multiplier of net sales higher than the multiplier at which the actual purchase was made. However, the official that reported this to Mr. Ruppert was not called as a witness by either party.

Petitioner offered the testimony of the accountant who had been assisting in keeping the records of SOAI for several years prior to 1981, and thereafter until the sale by SOAI of its assets. This witness testified that he did not know of any negotiations for the sale of assets of SOAI prior to about the time of the sale. However, he did say that in late 1985 John Cidulka asked him to prepare a valuation of the assets of SOAI and that he prepared what he considered a proper valuation of the assets based on their book value which was in the vicinity of $1 million, and that when he showed it to John Cidulka, John Cidulka told him to destroy the document. We, therefore, do not consider this record to show what negotiations, if any, led up to the sale of SOAI's assets in January 1986. We might note, however, that

if petitioner considered this fact important, petitioner could have called a witness from Whiteco to testify to the nature of the negotiations leading up to the sale.

Based on this record, we conclude that the best valuation we are able to make of the stock of SOAI at January 25, 1982, is on the basis of the 1981 net sales multiplied by a proper multiplier and adjusted to the value of the stock by reducing this amount for liabilities and other necessary items. There apparently is no dispute between the parties as to the method used by respondent's expert, Mr. Loe, to determine the value of the stock from the asset value.

Mr. Ruppert testified, based on a number of sales he considered comparable to sales of petitioner's assets, that a proper multiplier for the 1981 sales to arrive at the asset value at January 25, 1982, was between 2-1/2 and 3. He, therefore, concluded that a proper multiplier was 2.75. Mr. Ruppert's records showed very few sales that resulted in multipliers below 2.5 and numerous sales at multipliers of 3 or above. However, based on the fact that the asset sale made by SOAI in January 1986 showed a multiplier of 2.89 for sign (plant) structures and an overall multiplier of 3.11, and in the same year of the SOAI sale a much larger company sold at a multiplier of 3.90, and approximately a year later a smaller company sold at a multiplier of 3.38, we conclude that petitioner's sale of assets in January 1986 was at the lower end of the multiplier of sales at that

time. For this reason, we conclude that the lower end of Mr. Ruppert's scale of 2.5 to 3 is an appropriate multiplier to be applied to the net sales of SOAI for 1981 to obtain the fair market value of the assets of SOAI on January 25, 1982. We, therefore, hold that an asset sale of SOAI on January 25, 1982, should be at a multiplier of 2.5 applied to SOAI's net sales for the year 1981. The fair market value of the SOAI stock can be ascertained from this figure by making the adjustments made by respondent's witness, Mr. Loe.

The parties stipulated that the value of the SOAI stock transferred by decedent in 1980 and 1981 is the same as the value as of January 25, 1982, subject to any discount that the Court might determine applicable for marketability or minority interest due to the smaller number of shares transferred. There is not very much in the record with respect to an appropriate amount of either a marketability discount or minority interest discount. Respondent, to some extent, seems to contend that the 1980 and 1981 transfers were part of the same overall plan as the 1982 transfer. However, these transfers appear more to be a continuation of small gifts made by decedent to his family in prior years than part of the plan to give his son John the majority interest in SOAI in 1982. There is very little evidence in the record as to an appropriate amount for a marketability discount or a minority interest discount. Obviously, if all of the assets were sold, the minority shares would have the same per

share value in the distribution of the receipts from the sale as the majority shares. In fact, Mr. Ruppert testified in this regard. A marketability discount generally recognizes the difficulty in disposing of stock in a closely held corporation, and a minority interest discount is applied because of the lack of control of a corporation by a minority shareholder. A minority shareholder could not control the selling of the assets of the company in order to obtain the value from his stock. Since sales of outdoor advertising companies are generally asset sales by such a business, minority stock interests likely would be at a discount. See Estate of Hall v. Commissioner, 92 T.C. 312, 341 (1989). Both respondent's and petitioner's expert witnesses estimated a marketability discount, if one were appropriate, from 15 to 35 percent. Based on the testimony of both petitioner's and respondent's experts, as well as the record as a whole, we conclude that the minority interest given by decedent to his family in 1980 and 1981 should carry a discount of 25 percent for marketability and minority interest combined.

Finally, the parties discussed whether for 1980 and 1981 decedent's gifts should be limited to one exclusion of $3,000 each year as a gift to his son. As we said in discussing the 1982 gifts, it is clear on this record that the gifts of stock to Charlesa Cidulka were, in fact, gifts to her husband John Cidulka and, therefore, would not be entitled to a separate exclusion. The situation with respect to the stock given to John Cidulka's

two teenage children is the same in 1980 and 1981 as it was in 1982, except that for 1980 and 1981 they did acknowledge receipt of the stock on the stock register. However, they never received any benefits from the stock and did not receive their pro rata distribution when the assets of the company were sold. In other words, the stock decedent gave to his two grandchildren was not treated by their father, John Cidulka, as stock belonging to them. They were not shown as stockholders for purposes of corporate distributions. Based on this record, we conclude that in 1980 and 1981, as in 1982, the gifts of stock to John Cidulka's two children were, in effect, a gift to their father and certainly not in substance a gift to the children. Again, we point out that at the time of the trial, John Joseph and Laura were adults but were not called as witnesses. In each of the years 1980 and 1981 decedent was entitled to only one gift tax exclusion.

The final issue in this case is whether petitioner is liable for the additions to tax for failure to file a 1982 gift tax return and for negligence in not reporting the gifts made to John Cidulka in 1982. Petitioner contends that there was reasonable cause for decedent's failure to file a gift tax return in 1982, since his advisers, including his accountant and attorneys, had informed him that the gifts were not of sufficient value to require a return to be filed. The only testimony with respect to the advice given to decedent as to his gift tax liability is

testimony of the SOAI accountant.  He testified that based on valuing the SOAI stock at book value he concluded that the gifts in 1982 were not sufficient to require the filing of a return. He stated that he had considered the redemption of decedent's stock not to be a gift to any extent to decedent's son John Cidulka.  There is very little in the record about the nature of the discussions between decedent and his accountant and his attorney or attorneys, with respect to the plan to transfer the SOAI stock to John Cidulka without incurring any taxes.  There is no testimony in the record with respect to what decedent considered the value of the SOAI stock to be, and since he had been, for a good many years, in the outdoor advertising business and knew the nature and types of sales of assets made in that business, it certainly cannot be assumed without evidence that he was not personally aware that the value of the SOAI stock he transferred in 1982 was far in excess of an amount of the gift tax exemptions to which he would be entitled, and also aware that the note he received from SOAI in redemption of his stock was far less than the value of the stock.  Neither of decedent's attorneys was called as a witness.  We certainly will not assume without proof that they advised decedent that gift tax was based on book value of stock.  Viewing this record as a whole, we conclude that petitioner has failed to show that decedent acted in good faith and made a full disclosure of all facts with respect to the SOAI stock to his advisers.  Unless advice is as a

result of the full disclosure by a taxpayer of relevant facts, it is not reasonable cause for failure to file a return.  See Paula Constr. Co. v. Commissioner, 58 T.C. 1055, 1061 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973).  Because of the failure of petitioner to establish facts sufficient to show reasonable cause for decedent's failure to file his 1982 gift tax return, we sustain respondent's determination of the additions to gift tax under section 6651(a)(1).  Likewise, the evidence fails to show that decedent was unaware that the value of the gifts he made in 1982 was sufficient to require the payment of gift tax.  If he did have knowledge that a gift tax was due and did not file a return showing the tax due, and the record does not show to the contrary, the underpayment is due to negligence.  Therefore, we sustain respondent's additions to gift tax under section 6653(a)(1) and (2) for the year 1982.

Because of the issues disposed of by agreement of the parties, as well as our holdings herein,

Decisions will be entered under Rule 155.